UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Orlando Hobbs,                                        Civil No. 17-619 (FLN)

      Plaintiff,

      v.                                        **ORDER**

Nancy A. Berryhill,
Acting Commissioner of Social Security,

      Defendant.

_____

Jacob Reitan for Plaintiff.
Bahram Samie, Assistant United States Attorney, for Defendant.

_____

Plaintiff Orlando Hobbs seeks judicial review of the final decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA"), who denied his application for supplemental security income under Title XVI of the Social Security Act. This Court has jurisdiction over the claim pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), 28 U.S.C. § 636(c), and Rule 73 of the Federal Rules of Civil Procedure. The parties have submitted cross motions for summary judgement. *See* ECF Nos. 13 and 15. For the reasons set forth below, the Commissioner's decision is **AFFIRMED** and the case is **DISMISSED WITH PREJUDICE**.

## I. INTRODUCTION

On July 15, 2013, Hobbs applied for supplemental security income ("SSI"). Administrative Record ("AR") 223–29. Hobbs alleged a disability onset date of August 15, 2010. AR 125. Hobbs' application was initially denied on August 21, 2013, and upon reconsideration on January 29, 2014. AR 117–19. On February 24, 2014, Hobbs filed a written request for a hearing. AR 156. An

administrative hearing was held before Administrative Law Judge ("ALJ") Roger Thomas on June 23, 2015, and a supplemental hearing was held on November 4, 2015. AR 49–79, 80–123. On November 24, 2015, the ALJ found Hobbs was not disabled and denied his SSI application. AR 11–25. On December 22, 2015, the SSA Appeals Council denied Hobbs' request for review and finalized the ALJ's decision for purposes of judicial review. AR 1–6; *see* 20 C.F.R. § 404.981. On February 27, 2017, Hobbs commenced this civil action seeking reversal of the ALJ's decision and and awarding benefits, or in the alternative, remand for further proceedings. ECF No. 1 at 2.

## II. FINDINGS OF FACTS

### A. Background

Hobbs was fifty-five years old, a person of advanced age,  when he applied for SSI benefits. AR 125; *see* 20 C.F.R. § 404.1563. Hobbs claims the following severe impairments prevent him from securing and maintaining competitive employment: asthma, neck pain, headaches, and left shoulder injury. AR 126. Hobbs has at least a high school education and his past relevant work includes house repairer (medium-skilled), janitor (medium-unskilled), and construction laborer (very heavy-unskilled). AR 337, 346. Hobbs reported that he stopped working on July 12, 2013, after finishing a project hanging screen doors. AR 276. Hobbs, however, claims that his condition became severe enough to keep him from working on August 15, 2010. *Id.*

### B. Medical Evidence

#### 1. COPD/Asthma

On June 30, 2013, Hobbs presented to Patrick S. Inveen, M.D., his primary care physician, for a pre-operative evaluation. AR 411. Dr. Inveen reported that Hobbs had persistent asthma, his current regimen was effective, and that he had no acute concerns of exacerbation, or any other

complaints. *Id.* Dr. Inveen also noted that Hobbs' chest was clear to auscultation, with no wheezing or rales. AR 412.

On March 2, 2013, Hobbs visited Dr. Inveen complaining of coughing and shortness of breath. AR 584. Dr. Inveen observed Hobbs' history of asthma, and that he had not been taking his medications as prescribed. *Id.* Dr. Inveen also noted that Hobbs "priorities are for obtaining disability he is over his health improvement by taking the correct medications." AR 586.

On November 11, 2014, Hobbs presented to Gustavo Cortes, M.D., because of an asthma attack, lower back pain, and a skin rash. AR 588. Hobbs stated that his asthma was not well controlled over the last two months, and that he had been using his rescue inhaler more. *Id.* In his assessment, Dr. Cortes found that Hobbs had good mobilization of air in both of his lungs with sporadic wheezing. AR 589. Hobbs' inhaler steroid was changed, and he was advised to stop using e-cigarrets. *Id.* Angela Medina, M.D., also noted that Hobbs had no interest in quitting smoking. AR 590.

On August 5, 2015, Hobbs presented to Peter Cathcart, M.D., for chronic back pain, chest congestion, and knee pain. AR 620. Dr. Cathcart believed that Hobbs' chest congestion was due to a chronic obstructive pulmonary disease ("COPD") flare up and prescribed Hobbs Prednisone and Azithromycin. AR 621. He also told Hobbs to continue to use his inhaler. *Id.* A supervising note from Melinda Jorgensen, M.D., states that Hobbs had not received a formal diagnosis of COPD, but had a thirty-six year smoking history. *Id.*

On September 28, 2015, Hobbs presented to pulmonologist Nicholas Benson, M.D., for shortness of breath. AR 647. Dr. Hobbs informed Dr. Benson that he had asthma all his life, but that it was worse recently. *Id.* Hobbs reported that he had quit smoking the year before, but had been

smoking fifty-five packs a year before then. *Id.* Hobbs stated that he was short of breath all the time and felt very tight and wheezy almost every day. *Id.* Dr. Benson noted that Hobbs was using Combivent because he could not get his Albuterol inhaler refilled. *Id.* Hobbs reported that he was in the process of applying for disability benefits because of his symptoms. *Id.*

Dr. Benson examined Hobbs and found that he had no acute distress, and normal chest excursion, but had decreased air entry with significant expiratory wheezing, and his lungs sounded very tight. AR 651. Dr. Benson also found Hobbs' lung volume was normal, and that his spirometry had improved since March of 2014. *Id.* Hobbs' pulmonary function test showed a FVC to FVC ratio of fifty eight percent. *Id.* Dr. Benson suspected that Hobbs' had COPD and asthma. *Id.* He advised Hobbs to continue to refrain from smoking, and to get Pnuemovax and a flu shoot. AR 651–52. Dr. Benson believed that with treatment, Hobbs could get relief from his symptoms. AR 652. Hobbs informed Dr. Benson that he would not use oxygen if it was recommended. *Id.*

### 2. Neck pain, and left shoulder injury

On August 6, 2013, Hobbs underwent left shoulder arthroscopy. AR 137. Treatment notes from January 13, 2014, state that Hobbs had minimal complaints, and while his shoulder was still weak, he was steadily improving, walking with normal upper extremity swing, was not guarding his shoulder, and was progressing well overall. *Id.*

On February 24, 2014, Hobbs was seen by Michael D'Amato, M.D., for a follow-up of his left rotator cuff repair. AR 582. Dr. D'Amato noted that it had been six months since Hobbs had received his surgery, and that he was doing therapy and home exercises. *Id.* Hobbs reported that he could not work at his normal job as a contractor. *Id.* Dr. D'Amato explained to him that it typically takes a year before his strength returns, and that he needs to continue his therapy and strengthening

exercises. *Id*. Dr. D'Amato noted that Hobbs could work less strenuous activities if they were available to him. *Id*. However, he noted that Hobbs should avoid extremely heavy and strenuous lifting, pushing, and pulling activities. *Id*. Dr. D'Amato also found that Hobbs had no tenderness, had a full range of motion, no impingement, and good cuff strength. *Id*. Hobbs was told to follow-up with Dr. D'Amato in three months. *Id*.

On November 11, 2014, Hobbs visited Dr. Cortes for back pain and cough. AR 588. Hobbs complained of asthma, lower back pain, and a skin rash. *Id*. While shoulder pain was listed as a problem, Hobbs did not raise any issues with his shoulder. AR 588–91.

On February 9, 2015, Hobbs visited Chad Everett, M.D., for back pain and an enlarged prostate. AR 592. Hobbs reported that his pain moved back and forth from his right heel to his right back, and was worse when there was pressure on his right leg. *Id*. Hobbs said he had been using a cane to move around, and his pain was ten out of ten when he was walking. *Id*. His sensory and motor was found to be intact, with an essentially normal range of motion of the bilateral hip joints, no tenderness of the cervical or thoracic spine, mild palpable lumbar spine tenderness, and mild to moderate right lumbar paraspinal tenderness. *Id*.

On March 10, 2015, Hobbs again presented to Dr. Everette to get a note for his SSA disability hearing. AR 597. Hobbs did not make Dr. Everette aware of his application for disability prior to the visit. *Id*. Dr. Everette noted that he would not write a workability letter for Hobbs because he believed "this can be further evaluated by the medical spine clinic." *Id*. Dr. Everette noted that Hobbs did not go to his initial medical spine appointment. AR 598.

### 3. Hobbs' Functional Report

On December 17, 2013, Hobbs completed a SSA functional report. AR 294–301. Hobbs reported that in August of 2013 he had shoulder surgery, asthma, and vertigo. AR 294. He described his day as getting up, working on his arm, doing things his doctors advised him to do, and taking his medication for pain and asthma. AR 295. He reported that before his conditions that he was able to work sometimes. *Id*. He also reported that he was not able to do any household chores because of his shoulder and asthma, that he could only lift two pounds, that his asthma affected his ability to go up and down the stairs, and that his vertigo affected his ability to get out of bed. AR 299. Hobbs reported that he could walk one block without rest, and that in the last thirty years he had lost many jobs due to his asthma. AR 299–300. He said that he spends his time watching the Minnesota Vikings, has no problem with spoken instructions, and is fine managing his stress and adapting to changes in routine. AR 298–300. Hobbs reported that he had no problems with dressing, bathing, shaving, feeding, or using the toilet. AR 295. He said that he wears glasses, but did not report using a cane or any other assistive devices. AR 300. He reported that his medications were Albuterol, Azelstine, Cetirizine, Qvar, and Combivent Respimat. AR 301.

### 4. Opinion Evidence

On August 13, 2013, Charles Grant, M.D., a Disability Determination Services ("DDS") physician, completed a residual functional capacity ("RFC") assessment for Hobbs. AR 129–30. Dr. Grant opined that Hobbs could occasionally lift and/or carry twenty pounds, frequently lift and carry ten pounds, and stand and/or walk six hours in an eight-hour work day. *Id.* Dr. Grant opined that due to Hobbs' rotator cuff tear and subsequent surgery that "his overhead lifting [was] reduced to occasional on rt." AR 130. On January 28, 2014, upon reconsideration, DDS physician Steven

Richards, M.D., completed an RFC assessment for Hobbs. AR 139–40. Dr. Richards made the same findings as Dr. Grant. *Id.*

On March 17, 2014, Dr. D'Amato completed a SSA medical assessment on Hobbs' ability to do work-related activities. AR 547–50. Dr. D'Amato opined that Hobbs could work eight hours in a eight-hour work day, that he would miss zero to four days of work a month for physical therapy, that his standing, walking, and sitting were not affected by his physical impairments, and that he could carry ten pounds occasionally, and three pounds frequently. AR 547–48. Dr. D'Amato based his findings on the fact that Hobbs was recovering from rotator cuff repair surgery, and was still in physical therapy to build his strength. AR 548. Dr. D'Amato found that Hobbs could climb, balance, and crawl occasionally, and stoop, crouch, and kneel frequently. *Id*. He based this opinion on his finding that Hobbs did not have the strength to support his body weight safely. *Id.* Dr. D'Amato also found that Hobbs could finger, see, hear, and speak constantly, handle, push, and pull frequently, only occasionally reach, and should avoid repetitive motions to avoid muscle fatigue. AR 549.

On April 21, 2014, Dr. Inveen completed a pulmonary RFC questionnaire for Hobbs. AR 552–55. Dr. Inveen found that Hobbs had shortness of breath, chest tightness, wheezing, and coughing. AR 552. Dr. Inveen reported that Hobbs' asthma was mild and infrequent, and that he did not have any emergency visits or attacks in the last year. *Id.* Dr. Inveen also noted that he advised Hobbs to take his medications and have his lungs tested, but that Hobbs said "I'm not going to do that, I want the tests to show that I have trouble breathing." *Id.* Dr. Inveen stated that Hobbs was not taking his medication as prescribed, and that while Hobbs subjectively reported that his symptoms were interfering with his attention and concentration, that this was not consistent with his presentation. AR 553. He opined that Hobbs could work at a high stress job when he was taking his

medications, and his prognosis was excellent if Hobbs took his medication as prescribed. *Id.* Dr.

Inveen further opined that Hobbs could walk twelve city blocks without rest, could sit and stand

eight hours in an eight-hour work day, and did not need to take any unscheduled breaks. AR 553–54.

Additionally, Dr. Inveen found that Hobbs could frequently lift and carry up to fifty pounds, and did

not have any environmental restrictions. AR 554–55. Dr. Inveen stated that:

> Patient has been working without difficulty since 2009. He only started to complain to me about asthma after he was rejected for social security disability for shoulder rotator cuff tear and impingement. He was not taking his medication as recommended and told me he would not start them before his spirometry in order to show his breathing was not good. On top of this the spirometry showed significant improvement with [illegible] and questionable effort as identified by the pulmonologist.

AR 555.

On August 8, 2015, Dr. Inveen completed a medical opinion form regarding Hobbs' ability

to do work related activities. AR 570 –73. Dr. Inveen opined that Hobbs could occasionally lift and

carry twenty pounds, could frequently lift and carry ten pounds, could stand and walk four hours in

an eight-hour work day, and had no limitations on how long he could sit. *Id.* He further opined that

Hobbs could sit for ninety minutes, and stand for sixty minutes, before he needed to change

positions. AR 572. Dr. Inveen found that Hobbs' overhead reaching, pushing, and pulling were

affected by his left shoulder pain. AR 571. That Hobbs did not require any environmental work

restrictions for extreme colds, extreme heat, fumes, odors, dusts, or hazards, but that Hobbs should

avoid prolonged standing and walking, and that he had mild obstructive pulmonary disease. AR

571–72.

On August 20, 2015, Michael Goetz, M.D., completed the same medical opinion form

regarding Hobbs' ability to do work related activities. 574–77. Dr. Goetz opined that Hobbs could

frequently lift and carry ten pounds, could stand and work for three hours in an eight-hour work day, and could sit for six hours in an eight-hour work day. AR 574. Dr. Goetz found that Hobbs' condition did not affect his overhead reaching, and he had no environmental restrictions. AR 576. Dr. Goetz opined that Hobbs could only sit and stand for thirty minutes before needing to change positions. AR 575.

On October 29, 2015, Dr. Benson wrote a letter regarding Hobbs' limitations due to his chronic lung disease. AR 662. Dr. Benson noted Hobbs' evaluation on September 28, 2015, for shortness of breath. *Id.* He opined that the pulmonary testing done on that date was consistent with moderate obstructive lung disease. *Id.* Dr. Benson found that due to his chronic lung disease, Hobbs would require certain work restrictions. *Id.* According to Dr. Benson, Hobbs would not be able to lift more than twenty pounds, crawl, repeatedly bend forward or over, or repeatedly lift over his head. *Id.* Dr. Benson opined that

> [Hobbs] also needs to avoid working in extreme cold or hot conditions as this can trigger a breathing exacerbation. He also needs to avoid exposure to any environment with more than just mild amounts of dust or particulates in the air. He will need to avoid working around chemicals and materials with strong fumes or odors or particles that can be dispersed in the air, including but not limited to paint or stains, cleaning chemicals, adhesives, sheet rock dust, insulation, gas diesel fumes, welding fumes, and sand blasing or stone cutting dust. He will need to avoid any construction zones that contain these or similar exposures.

*Id.*

On November 3, 2015, Dr. Inveen also opined on Hobbs' COPD. AR 663. Dr. Inveen stated that Hobbs has moderate COPD with bronchodilator response. *Id.* He agreed with Dr. Benson's evaluation that certain work environments could exacerbate Hobbs' underlying lung disease, and agreed that Hobbs should not work in extreme temperatures, around noxious chemicals, or in work environments that require heavy exertion. *Id.*

### C. The Administrative Hearing

Hobbs' initial administrative hearing, held on March 11, 2015, was post-poned so he could consult with an attorney. AR 115–23. On June 23, 2015, a second hearing was held where testimony was taken from Hobbs, who appeared without counsel, and Vocational Expert ("VE") Steven Bosch. AR 80–114. On November 4, 2014, a supplemental hearing was held. AR 50 –79. Hobbs appeared with his attorney Jacob Reitan, who took supplemental testimony from the VE, and submitted new evidence into the record. *See id.*

#### 1. June 23, 2015, hearing

During the initial administrative hearing, the ALJ took testimony from Hobbs, and then posed the following hypothetical to the VE:

> Mr. Bosch, having you assume, of course, we're discussing an individual with the age range of 53 to 57 years. He does have at least a 12th grade education, of course past work as you've noted amended by your testimony. He does have impairments. There's some records of left shoulder pain. He has had some treatment . . . a tearing of the supraspinatus tendon and he had also some complaints of breathing difficulties more recently at least . . . . There's a remote history of a motor vehicle accident apparently about 10 years ago. He's had some residual neck pain by testimony, sciatic nerve pain more recently here, apparently since last November. Now for those impairments that are severe had has limitations. . . . One evaluator limited him to a light range of work and no more than occasional tasks with the left upper extremity overhead. Beginning with those limitations . . . . Could a person do any of the past jobs that you've noted in your report?

AR 107–09. The VE testified that an individual with those limitations could not perform Hobbs' past relevant work, but could perform work as a house repairer and a contractor. AR 110. The ALJ then added the following additional limitation: that the individual "shouldn't be in areas where there could be, as part of the normal job task, high concentrations of dust, fumes, gases and the like." *Id*. The VE testified that an individual in the second hypothetical could not perform any of Hobbs' past relevant work and would also be precluded from working on a construction site due to air

contaminants. *Id.* The VE, however, testified that such an individual could work as a cashier. *Id.* Hobbs then informed the ALJ that he would not be able to obtain work as a cashier because he had two felonies, one of them for theft. AR 111–12.

### 2. November 4, 2015, hearing

During the November 4, 2015, a supplemental hearing, the VE testified that Hobbs' had past relevant work as a self-employed contractor, and the VE assumed that Hobbs was doing the full range of self-employed repair work including estimating and supervising others. AR 60. Based on this, the VE testified that Hobbs had acquired the work skills of estimating, "sales and customer service, dealing with potential clients in terms of making the repair; basic bookkeeping and record keeping related to the jobs that were being done; ordering construction materials and supplies; use of hand and power tools" and "maybe supervising others." AR 61.

Hobbs' attorney then posed the following hypothetical to the VE: if a person with the same limitations as the hypothetical person in the previous hearing, "needed to avoid exposure to any environment with more than mild amounts of dust or particles in the air" and

> [n]eeds to avoid working around chemicals and materials with strong fumes or odors, particular particles that can be dispersed in the air including, but not limited to, paints or stains, cleaning chemicals, adhesives, sheetrock, dust, insulation, gas/diesel fumes, welding fumes and sandblasting or stone cutting dust and needs to avoid any construction zones that contain these or similar exposures.
>
> What jobs can you identify that . . . the proposed claimant's transferable skills would open him up for?

AR 62. The VE testified that those limitations would preclude all of Hobbs' past work, but would not eliminate work as an estimator. *Id.* The VE also testified that such an individual could work as a telemarketer for a construction firm, which is a sedentary semi-skilled job with approximately 500 jobs in Minnesota, as well as an appointment clerk and a general hardware salesperson. AR 63–66.

After a long exchange between Hobbs' attorney and the ALJ regarding the appropriateness of the following hypothetical, the ALJ allowed Hobbs' attorney to ask the VE:

> Mr. Bosch, in terms of the unskilled/light and unskilled/sedentary job base of 1,600 occupations of which there's administrative notice, in your estimation, how many of those jobs would be reduced by a hypothetical that would limit a proposed claimant to needing to avoid working at extreme cold or hot conditions; needing to avoid exposure to any environments with more than just mild amounts of dust or particles in the air; needing to avoid working around chemicals and materials with strong fumes or odors or particles that are dispersed in the air including, but not limited, to paints or stains, cleaning chemicals, adhesive, sheetrock/dust insulation, gas/diesel fumes, welding fumes, sandblasting and stone-cutting dust and needing to avoid any construction zones that contain these or similar exposures, how many jobs are further diminished from the unskilled, light and sedentary job base based on that limitation?

AR 73–74. The VE responded that a third of the jobs would be diminished. *Id.* Hobbs' attorney then asked whether that number was more than or less than the number of jobs added based on Hobbs' transferable skills. AR 75. The VE testified that it was less than by a factor greater than ten. AR 76. Shortly thereafter, the ALJ concluded the hearing. *Id.* Hobbs asked the ALJ to take testimony regarding his pain, and the ALJ informed him that his pain was considered at the prior hearing. AR 77.

### 3. The Commissioner's Decision

On November 24, 2015, the ALJ issued a decision that Hobbs was not disabled and not entitled to benefits. AR 10–20. In determining that Hobbs was not disabled, the ALJ followed the five-step sequential process established by the SSA. *See* 20 C.F.R. § 404.1520(a)(4).

The first step in the sequential evaluation is to evaluate the claimant's work history to see if they are engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.15071, 416.971. If the claimant has performed substantial work activity then he is not disabled. *Id.* At step one, the ALJ found that Hobbs had not engaged in substantial gainful activity since June 21, 2013, the date of his application. AR 12.

The second step in the sequential evaluation is to determine whether the claimant has a severe, medically-determinable impairment, or combination of impairments, that significantly limits an individual's ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). At step two, the ALJ found that Hobbs had the following severe impairments: a history of left shoulder injury followed by surgery and degenerative disc disease of the lumbar spine. AR 12. The ALJ considered Hobbs' asthma, noting that it was also referred to as chronic obstructive pulmonary disease ("COPD") in some medical records, but found that there was "no evidence of significant exacerbations, asthma-related hospitalizations, or emergency treatments for respiratory deficits." *Id.*

The third step in the sequential evaluation requires the ALJ to determine whether the claimant has an impairment that meets or equals one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If, at this step, the ALJ finds that the claimant's impairments or combination of impairments does not meet or medically equal the criteria of a listing, nor meet the duration requirement, then the analysis must proceed to the next step. At this step, the ALJ found that Hobbs did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. AR 13.

Because Hobbs' impairments did not meet or equal one of the listings in Appendix 1, the ALJ made an assessment of the Hobbs' RFC. The ALJ found that Hobbs had an RFC to "perform

light work as defined in 20 CFR 416.967(b) except that he is limited to occasional overhead reaching with the left upper extremity." AR 13–14. As part of his RFC, the ALJ concluded that while Hobbs' medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. AR 14.

In the fourth and fifth steps of the sequential evaluation process, the ALJ must determine whether the claimant has the RFC to perform either his past relevant work or any other jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1512(g), 404.1520(f), 404.1560(c), 416.912(g), 416.920(g), 416.960(c).   If the claimant cannot perform his past relevant work, then the "burden shifts to the SSA to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

At step four, the ALJ found that Hobbs was not able to perform his past relevant work. AR 18. This determination was based on the VE's interrogatory response that Hobbs' past relevant work as a house repair contractor, janitor, and construction laborer exceeded the light exertional level he was capable of. *Id*. The ALJ, however, determined that Hobbs' had acquired the following work skills from his past relevant work: "finishing construction techniques, electrical and plumbing repair, use of hand and power tools, client/customer assistance, estimating, and other related bookkeeping." Id.

At step five the ALJ concluded that considering Hobbs' age, education, work experience, and RFC, there were jobs in significant numbers in the national economy that he could perform. AR

14

18–19. Specifically, the ALJ found that although Hobbs' additional limitations did not allow him to perform a full range of light work, that his age, education, and transferable work skills meant that he was not disabled under the framework of Medical Vocational Rule 202.17. AR 20. As a result, the ALJ that Hobbs was not disabled. *Id.*

### III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Quals v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richard v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from

its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome. . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* Therefore, this Court's review of the ALJ's factual determinations is deferential, and does not re-weigh the evidence nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th. Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th. Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

### III. CONCLUSION OF LAW

#### 1. COPD/Asthma as a Severe Impairment

Hobbs argues that the ALJ's determination that his COPD and/or asthma is not a severe impairment was not supported by substantial evidence in the record. *See* ECF No. 13 at 13–19.

Specifically, Hobbs argues that the ALJ's reasoning was flawed, objective medical records indicate that his COPD was severe and persistent, and that the medical opinion of his pulmonoligst Dr. Benson was consisted with Hobbs' own self-limitations and the medical record as a whole. *Id.* The Commissioner, in turn, argues that the ALJ properly determined that Hobbs' COPD was not severe because his condition was well-controlled with the use of inhalant medications, and medical records showed that Hobbs had a history of not taking his medication in order to obtain disability benefits. ECF No. 15 at 6–10. Further, the Commissioner argues, that even if the ALJ erred in determining that Hobbs' COPD and/or asthma was not severe, that error is harmless. *See generally id.*

At step two, the ALJ must determine "whether the claimant has an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007); *accord* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521, 416.920(a)(4)(ii). If an impairment only amounts to a "slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities," then the impairment is "not severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of demonstrating that his impairment is severe. *Id.* "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." *Id.* (citation omitted); *see also Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (finding that a claimant's condition of migraine headaches did not constitute a severe impairment where the record was void of any diagnostic testing and where the claimant worked for several years with the headache and there was no evidence that it had worsened).

Here, the ALJ concluded that Hobbs' only severe impairments were a history of left shoulder injury followed by surgery, and degenerative disc disease of the lumbar spine. AR 12. The

ALJ specifically addressed Hobbs' asthma and COPD, and found that the medical records from the relevant time frame did not contain any evidence of significant exacerbations, asthma-related hospitalizations, or emergency treatment for respiratory deficits. *Id.* The ALJ observed that Hobbs' lung condition appeared to be well controlled with the use of an inhaler, and noted that the medical records showed that Hobbs' asthma regiment was effective, his asthma was mild,  he was not using his inhaler as indicated, was not willing to quit smoking, and was trying to obtain disability benefits. AR 13. Based on this, the ALJ found that Hobbs' asthma and COPD had no more than a minimal impact on his work functioning, and was not severe. *Id.*

Hobbs' treatment notes show that his COPD and asthma were well-controlled with the use of inhalant medication, *see* AR 411, that he was not using his inhaler as recommended, *see* AR 586, and that he was advised by his treating providers to refrain from smoking, but that he was not willing to quit smoking, *see* AR 590, and that he was seeking to obtain disability benefits based on his COPD and asthma. *See* AR 586. While there are treatment notes that suggest that Hobbs' COPD was persistent and severe,  this Court's job to re-weigh the evidence. *See Flynn*, 107 F.3d at 617. Rather, this Court's inquiry is limited to determining whether there is substantial evidence in the record to support the ALJ's determination. Accordingly, this Court finds that the ALJ's findings were supported by substantial evidence in the record.

Additionally, the Court observes that the ALJ's alleged error at step two was harmless. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (8th 2008). Had the ALJ denied Hobbs' claim for benefits at step two, the ALJ's impairment determination could be reviewed. However, at step two, the ALJ found that Hobbs' had other severe impairments, and proceeded to the next step of the evaluation process. *See, e.g.*, *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (finding that because the ALJ

found other impairments severe at step two, any error would be harmless because the ALJ reached the conclusion that the claimant could not be denied benefits at step two).

### 2. ALJ's RFC Finding

Hobbs also maintains that the ALJ's RFC finding that he could perform light work is inconsistent with the medical record as a whole, the medical opinions of Hobbs' treating physicians, and Hobbs' own testimony of his limitations. ECF No. 13 at 19.

An ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all the relevant evidence[,] . . . [but] a claimant's [RFC] is a medical question" that requires "[s]ome medical evidence" in support. *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must not "succumb to the temptation to play doctor and make their own medial findings." *Pate–Fires v. Asutre*, 564 F.3d 935, 947 (8th Cir. 2009). This Court's review of the ALJ's factual determinations is deferential, and it neither re-weighs the evidence, reviews the factual record *de novo*, *see Flynn*, 107 F.3d at 617, nor reverses when an ALJ's decision falls within a reasonable "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). If the ALJ's decision is supported by substantial evidence in the record, this Court cannot reverse simply "because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468.

In making his determination, the ALJ considered all of Hobbs' symptoms, and the extent that those symptoms were consistent with the objective medical evidence. AR 14. For example, the ALJ reduced Hobbs' exertional level to light in consideration to his low back pain and its radiation into his lower extremities. *Id.* The ALJ also took into account Hobbs' statements concerning the intensity and persistence of his impairments, and found that those statements were not entirely credible. *Id.*

In assessing a claimant's credibility, "[t]he ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). An ALJ's credibility determination will not be disturbed when the ALJ "considers, but for good cause expressly discredits, a claimant's complaints of disabling pain." *Id.* The ALJ, however, must consider a claimant subjective complaints within the context of their: (1) daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1321–21 (8th Cir. 1984).

Here, the ALJ found that based on Hobbs' own functional report, that he was capable of activities that were not nearly as limiting as would be expected given his complaints of disabling symptoms and limitations. AR 16. The ALJ found that Hobbs reported that his impairments were severe, but that he was able to independently attend to his personal care needs, including dressing, bathing, eating, and toiletting. AR 16; *see also* AR 295. The record further shows, that while Hobbs stated in his functional report that he was only able to walk for one block without rest, his treating physician, Dr. Inveen, opined that Hobbs could walk twelve city blocks without rest. AR 299, 553. The ALJ also observed that Hobbs' treatment notes stated that he was not taking his medication as prescribed in an effort to receive disability benefits. AR 586. Thus, the ALJ's credibility determination in light of the objective medical evidence was proper.

### 3. Weight Assigned to Treating Physicians

Hobbs also argues that the ALJ erred when he gave the opinions of Dr. Inveen and Dr. Goertz, Hobbs' treating medical sources, little weight. ECF No. 13 at 23. Generally, a "treating physician's opinion is entitled to controlling weight," so long as it is "supported by medically

acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016) (citing *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008)). If, however, the treating physician's opinion "is not given controlling weight, then the ALJ must review various factors to determine how much weight is appropriate." *Id.* (citing 20 C.F.R. § 416.927(c)). These factors include (i) the examining relationship, (ii) treatment relationship, (iii) supportability, (iv) consistency, (v) specialization, and (vi) other factors. *See* 20 C.F.R. § 416.927(c). Opinions of treating physicians . . . may be given limited weight if they are . . . inconsistent with the record." *Id.* (citing *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015)). Regardless of how much weight the ALJ affords a treating physicians opinion, the ALJ must "always give good reason" for the weight given. 20 C.F.R. § 404.1527(d)(2). Failure to provide good reason for discrediting a treating physician's opinion is grounds for remand. *See* 20 C.F.R. § 404.1527(c)(2).

The ALJ gave the opinions of Dr. Inveen and Dr. Goetz little weight because he found that they were not supported by the record. AR 17. Specifically, the ALJ found Dr. Inveen's opinion that Hobbs was limited to only standing and walking for four hours in an eight-hour workday, and Dr. Goetz' opinion that Hobbs should be restricted to sedentary work, was inconsistent with the medical evidence in the record. AR 18. This Court agrees.

While Dr. Inveen opined that Hobbs could only stand and walk for four hours in an eight-hour work day, Dr. Grant and Dr. Richards, the agency's DDS physicians, both opined that Hobbs could stand and walk six hours in an eight-hour work day. *See* AR 129–30, AR 139–40. Dr. D'Amato similarly opined that Hobbs' physical impairments did not affect his standing, walking, or sitting. AR 547–48. Likewise, while Dr. Goetz opined that Hobbs should be restricted to sedentary work, Hobbs' treatment notes demonstrate that if he took his medication as prescribed that

he was capable of more than sedantary work. Therefore, this Court finds that the ALJ did not err in assigning little weight to the opinions of Dr. Inveen and Dr. Goetz, and provided good reason for discounting their opinions.

### 4. Environmental Limitations of COPD and/or Asthma

Hobbs also argues that because his COPD and/or asthma are severe conditions, that the ALJ should have included environmental limitations in his RFC. ECF No. 13 at 26. Because this Court finds that the ALJ's determination that Hobbs' COPD and asthma were not severe conditions was supported by substantial evidence in the record, it consequently finds that the ALJ did not err in not including any environmental limitations in Hobbs' RFC based on those impairments. Additionally, the Court observes that Hobbs' treating physicians Dr. Inveen and Dr. Goetz both opined that Hobbs did not require any environmental limitations.

### 5. Hobbs' Transferable Skills

Hobbs also asks this Court to hold an additional supplemental hearing regarding his transferable skills. ECF No. 13 at 27. Hobbs, however, has not provided any legal authority requiring this Court to order an additional supplemental hearing or permit such testimony, and this Court does not find that an additional supplemental hearing is necessary. "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). An ALJ is not required to seek clarifying testimony or documents unless a crucial issue is underdeveloped. *See Goff,* 421 F.3d at 791. At the end of the hearing, Hobbs asked the ALJ if he could testify regarding his significant pain. AR 77. Hobbs, nor his defense counsel, sought an opportunity to present additional testimony on the issue of his transferable skills. Rather, Hobbs'

counsel, during the supplemental hearing, focused on questioning the VE with regards to Hobbs' transferrable skills. Accordingly, this Court finds that Hobbs is not entitled to an additional supplemental hearing to allow him to testify as to his transferable skills.

Hobbs also asks this Court to find that the ALJ's erred at step five by failing to "find that the jobs identified by the VE constituted a significant range of work." ECF No. 13 at 27. Hobbs argues that the ALJ failed to specify what he believed a significant range of jobs to be, or how Hobbs' skills transfer to jobs that equal or surpass that range. *Id.*

Hobbs is an individual of advanced age with at least a high school education. *See* 20 C.F.R. §§ 404.1563(e), 404.1564(b)(4). The VE testified that Hobbs' past relevant work was semi-skilled, and the ALJ found that Hobbs had an RFC to perform light work activity. *See* AR 18–20; *see also* 20 C.F.R. § 404.1568(b). Under the Medical Vocational Guidelines, when a claimant's impairments are solely exertional, the ALJ may rely on the vocational guidelines to determine whether a claimant is disabled. *See Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998); 20 C.F.R, § 404.1569; 20 C.F.R. § 404, Subpt. P, App. 2, §§ 200.00–204.00. Medical Vocational Guideline Rule 202.07 directs a finding of not disabled for an individual of advanced age with at least a high school education, who has skilled or semi-skilled previous work experience with transferable skills. 20 C.F.R. § 404, Subpt. P, App. 2, § 202.07. In contrast, Rule 202.06 directs a finding of disabled for the same person if they have no transferable skills. 20 C.F.R. § 404, Subpt. P, App. 2, § 202.06. Under Rule 202.00(c), if an individual's transferable skills are not "readily transferable to a significant range of semi-skilled or skilled work" that individual should be found disabled. 20 C.F.R. § 404, Subpt. P, App. 2, § 202.00(c).

In *Lounsbury v. Barnhart*, the Ninth Circuit found that the phrase "significant range of . .

. work" requires that the there be more than one occupation that the claimant's skills would transfer to. 468 F.3d 1111, 1117 (9th Cir. 2006). The court reasoned that "the term 'work' under Rule 202.00(c) means distinct *occupations*, and 'significant numbers' is no substitute for and cannot satisfy the plan language of Rule 202.00(c) requiring a 'significant *range* of . . . work.'" (emphasis in original) *Id.*; *see also Prokes v. Colvin*, No. 14-915 (LIB) (D. Minn. Mar. 30, 2015) (accepting the Ninth Circuit's holding in *Lounsburry* and holding that one occupation alone cannot constitute a "significant range" of work.).

The ALJ found that based on the VE's testimony that an individual with the same age, education, past relevant work experience, and RFC as Hobbs, with the acquired skills from his past relevant work, but no additional skills, could perform work as a construction estimator and an assistant construction superintendent. AR 19. The ALJ determined that Hobbs had acquired the following skills from his past relevant work: "finishing construction techniques, electrical and plumbing repair, use of hand and power tools, client/customer assistance, estimating, and other related bookkeeping." AR 18. The ALJ also noted that even adding the additional environmental limitation posed by Hobbs' counsel at the hearing— avoiding extremely  hot or cold conditions, avoiding environments that involved anything more than mild amounts of particulates or dust in the air, and avoiding chemicals, paints, dust, and construction zones that contain these or similar exposures—that Hobbs would still be able to perform the job of construction estimator, and also perform work as a telemarketer. AR 19. Accordingly, this Court finds that the ALJ did not err in not specifically stating that the jobs identified by the VE constituted a significant range.

## IV. CONCLUSION

If the ALJ's decision is supported by substantial evidence on the record, this Court cannot

reverse simply because "substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468. Here, substantial evidence supports the ALJ's determination that there exists jobs in significant numbers in the national economy that Hobbs can perform. Accordingly, this Court affirms the ALJ's decision denying Hobbs' applications for SSI benefits, and grants the Commissioner's motion for summary judgment.

## V. ORDER

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Hobbs' motion for summary judgment (ECF No. 13) is **DENIED**;

2.      The Commissioner's motion for summary judgment (ECF No. 15) is **GRANTED**;

3.      The Commissioner's decision is **AFFIRMED** and the case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


DATED: August 21, 2018                     *s/Franklin L. Noel*
                                           FRANKLIN L. NOEL
                                           United States Magistrate Judge